UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK:  COURT OF CLAIMS
………………………………………………….X

TYRONE HICKS,

        Plaintiff,

            v.                             COMPLAINT AND JURY
                                               DEMAND


THE CITY OF NEW YORK, DETECTIVE MICHAEL
MARCHMAN, DETECTIVE CATALANO,
DETECTIVE LYNCH, AND JOHN
AND JANE DOES.

        Defendants.
……………………………………………………X

        Plaintiff Tyrone Hicks, by and through his attorney, Adele Bernhard, Esq., states as

follows:

## **INTRODUCTION**

        1.      Mr. Hicks, a veteran, honorably discharged from the Naval Services, with a

history of serious psychiatric ailments exacerbated by this wrongful prosecution and

incarceration, spent seven years in New York State correctional institutions wrongfully

convicted of attempted rape, assault and attempted sodomy.  After release he was forced to

register quarterly as a sexual offender for five years before his convicted was vacated in 2012.

He was finally exonerated in May 2014.

        2.      Mr. Hicks did nothing to cause or bring about his wrongful conviction.  DNA

testing established his actual innocence of the crime.

3.      On February 23, 1998 a stranger brutally attacked TT[1] on a Bronx street at night. TT was subsequently misled into wrongly misidentifying Mr. Hicks by unconstitutionally suggestive identification procedures employed by New York City Police Officers, which led inexorably to his misidentification and wrongful conviction.

4.      The harm caused by the suggestive identification procedures was compounded by police failure to disclose material exculpatory evidence.

5.      Moreover, police failed to inform the prosecution that they used suggestive identification procedures and failed to reveal the existence and non-disclosure of the exculpatory material.

6.      Mr. Hicks was convicted because a confluence of unconstitutional and tortious behavior by New York City Police.  These government actors, acting individually and in concert, not only kept exculpatory evidence from the jury, but also improperly suggested to TT that Mr. Hicks was her attacker.

7.      Mr. Hicks' conviction could and should have been avoided but for the intentional misconduct of the police who investigated the case.

8.      Mr. Hicks was convicted of attempted rape in the first degree and attempted sodomy in the first degree on October 26, 1999.  His conviction was affirmed at 11 A.D.3d 261, 783 N.Y.S.2d 15 (1st Dept. 2004) and the Court of Appeals declined to hear the case at 6 N.Y.3d 737 (2005).

9.      Mr. Hicks never stopped working to clear his name. He filed numerous Freedom of Information Law Requests *pro se,* filed a post-conviction C.P.L 440 motion *pro se* and,

---

[1] The victim shall be referred to in this complaint as TT to protect her privacy,

writing from prison, contacted the Pace Law School Post-conviction Project in 2007 to request assistance in his continuing efforts to establish his innocence.

10.     Eventually, in 2010, biological evidence collected from the crime scene was located and subjected to sophisticated DNA testing.

11.     The exclusionary test results compelled Supreme Court Justice Darcel D. Clark to vacate Mr. Hicks' conviction on the grounds of newly discovered evidence on October 5, 2012. Justice Clark's decision was affirmed on February 27, 2014 by the Appellate Division, First Department at 114 A.D.3d 599 (1st Dept., 2014), after which the District Attorney, Bronx County, moved to dismiss all charges against Mr. Hicks on May 15, 2014.

## JURISDICTION

12.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

13.     Supplemental jurisdiction over Plaintiff's pendant state law claims exists pursuant to 28 U.S.C. § 1367(a).

14.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by making and serving a notice of claim on the Comptroller of the City of New York on July 29, 2014, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

15.     At the request of the City of New York, Plaintiff Tyrone Hicks submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

**VENUE**

16.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York, the judicial district in which the claims arose.


**JURY DEMAND**

17.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.


**PARTIES**

18.     Plaintiff Tyrone Hicks was at all times relevant to this Complaint a resident of the State of New York. Plaintiff Tyrone Hicks currently lives in South Carolina.

19.     Defendant Detective Michael Marchman, # 2001, Bronx Special Victims, was at all times relevant to this Complaint a duly appointed and acting police officer of the New York Police Department ("NYPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

20.     Defendant Detective Catalano was at all times relevant to this Complaint a duly appointed and acting police officer of the New York Police Department ("NYPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

21.     Defendant Detective Lynch, 48th Precinct was at all times relevant to this Complaint a duly appointed and acting police officer of the New York Police Department

("NYPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

22.     Defendants John and Jane Does #1-x, whose actual names plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John and Jane Does" include individual officers, direct supervisors and command-level supervisors within the NYPD, who were, at all times relevant to the Complaint, duly appointed and acting police officers of the NYPD and include officers with responsibilities over the hiring, training and supervision of NYPD officers, including the individual defendants named herein, acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

23.     Defendant City of New York is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department.

### THE CRIME, INVESTIGATION, WRONGFUL CONVICTION OF TYRONE HICKS AND HIS EVENTUAL EXONERATION:

#### The Crime: A Stranger Attacks TT.

24.     On February 23, 1998 TT was trying to place a phone call from a booth in front of an apartment building at 2303 Valentine Ave., Bronx, NY when she was attacked by a man she did not know.[2]

---

[2] Mr. Tyrone Hicks was not present when TT was assaulted or when she was interviewed by police during their investigation. The facts in this verified complaint are made to the best of Mr. Hicks' information and belief, and are

25.     The perpetrator grabbed TT around her neck, forcibly pulled her from the booth, and dragged her into an alley behind the apartment building at 2303 Valentine.

26.     In the alley, the perpetrator ripped off TT's clothes and repeatedly attempted vaginal and oral intercourse.  He pushed his genitals into TT's face and onto her vagina. Threatening to "put her to sleep," the perpetrator squeezed her throat to subdue her.  TT struggled desperately for air.

27.     TT did not submit passively. She defended herself with her hands, fighting and pushing the attacker away.  In the decision vacating Mr. Hicks' conviction, Justice Clark wrote, "the facts of the case involve a particularly brutal and violent assault where the victim testified at trial that she 'struggled,' 'resisted' and 'fought her attacker.'"

28.     TT fought back so furiously that the perpetrator did not succeed at penetration. The perpetrator did not ejaculate and, as a result, left no semen to be tested for a DNA profile.

29.     Tenants of the building at 2303 Valentine heard TT struggle, opened their windows and shouted.  A female caller dialed 911 and described the perpetrator as a male black, 5'9" tall, wearing all black clothing, bald, with a mustache.

30.     The perpetrator ran away. Police arrived. TT described the perpetrator to the police as a male/black, large-in-build, with a bald head and mustache, dressed in black clothing.  She said that he was between 5'11" and 6'0" tall; 25 years old; and had a "pocked mark" face.  TT was 27 years old at the time, so she was guessing that the perpetrator was close to her age.

---

based in part on the testimony provided by TT at a pre-trial hearing, at trial, at the post-conviction C.P.L. 330 hearing, and on information contained in police reports completed by the investigating officers.

**Technicians Collect and Preserve Crime Scene Evidence.**

31.     First responders took TT to Jacobi Hospital where technicians inspected her

injuries; swabbed her body in a search for forensic evidence; and collected fingernail

scrapings. Wooden dowels were used to collect biological material from under the nails.

32.     Police requested the collection of TT's fingernail cuttings and scrapings because

clues can be lodged under nails – especially after a physical struggle.  DNA extracted from

fingernail clippings of victims is always a possible source of DNA from the perpetrator in

cases where victims struggled or defended themselves.[3]  At the time, however, technology was

inadequate to test such a small sample of biological material for a DNA profile.

33.     Pre-trial, the office of the Bronx District Attorney informed Mr. Hicks that there

was no crime scene evidence to test for forensic evidence.


**SUGGESTIVE IDENTIFICATION PROCEDURES CONVINCE TT THAT TYRONE HICKS WAS
THE PERPETRATOR.**

34.     On February 23, the morning after the assault, Detective Michael Marchman,

BXSV, took TT to the 48th precinct "CATCH" unit to look at photographs generated by

computer program.

35.     Marchman asked the CATCH officer to select, for TT to view, photographs of

black males who generally met the description TT provided:  large-in-build black men arrested

in the 46th Precinct.[4]  Marchman did not ask the CATCH officer to limit the photographs to

persons arrested for sex offenses.  He testified the CATCH computer would have showed TT

---

[3] Oz, Zamir, *An Evaluation of the Relevance of Routine DNA Typing of Fingernail Clippings for Forensic Casework*, 45(1) J. Forensic Sci,. 158-160 (2001).
[4] At the subsequent pre-trial hearing exploring admissibility of TT's identification testimony, Marchman described the procedures and protocols he used at the CATCH unit.

photographs of individuals arrested and convicted in the previous six years of all kinds of crimes in the 46th precinct.

36.     If the CATCH operator followed the instructions provided by Detective Marchman, TT would have seen a photograph of Mr. Hicks since he matched the general physical description provided and had been convicted of drug offenses in the 46th precinct within the previous six years.

37.     Since she did not select anyone that day from the CATCH computer, on information and belief, TT viewed and rejected Tyrone Hicks' photograph as being a likeness of the person who attacked her. She rejected his photograph on the morning of February 23rd -- right after the attack, when her memory was fresh and had not been contaminated by suggestive police arranged identification procedures.

38.     However, at the pre-trial hearing on the admissibility of TT's identification, Detective Marchman, without any basis, swore that Tyrone Hicks' photograph was definitely not in the group of photographs TT viewed at the CATCH unit on February 24, 1998.

39.     Detective Marchman admitted that he did not select the CATCH photographs himself, did not view the CATCH photographs, was only in the room with TT intermittently, and thus would have had no way to ascertain what CATCH photographs TT saw.

40.     No officer provided information about which photographs were shown to TT that day.  In fact, Detective Marchman testified that the photographic session at the CATCH unit could not be reproduced.

41.     Thus, on information and belief, Marchman's testimony on this point was false and misleading.

42.     Moreover, Marchman failed to inform the Office of the Bronx District Attorney that Mr. Hicks' photograph was likely viewed and rejected by TT.

**TT Creates a Sketch.**

43.     On February 27, 1998 TT worked with a police artist to create a sketch of the perpetrator. The sketch was enlarged into a widely distributed poster.  The sketch shows a bald man with a round face and distinctively narrow eyebrows.  The poster provides information about the attack and notes that the perpetrator was between 30-35 years old, 5'11" tall, 200 pounds, and bald.

**The Investigation in Context – the "Bronx Rapist."**

45.     While police were investigating the rape of TT, they were also trying to solve a series of other rapes in the Bronx that occurred around the same time and in the same area.

46.     Police believed that the person who attacked TT also committed the other sexual assaults.

47.     For example, on the morning of February 23, 1998 -- the same day TT was attacked -- the body of a young teen was discovered on the sidewalk directly across the street from where someone attacked TT at 2303 Valentine.

48.     That teen had been raped and strangled to death.  According to Detective Creegan, chief of the Bronx detective bureau, who spoke to David Rhodes of the New York Times, there was a connection between the cases.[5]

49.     Also, on March 8, 1998 a woman who worked for the Housing Authority was badly beaten and raped a block from where the teen-ager's body was discovered.

_____

[5] Semen was found in the body of the teen, but that semen was not tested until 2010 when Mr. Hicks' DNA was excluded from the male biology found under TT's fingernails.  Mr. Hicks' DNA was compared to and excluded from the semen found in the body of the teen.

50.     Thus, police believed that TT's sketch depicted a person who had committed multiple sexual crimes.

**Police Fail to Preserve the Photo Arrays.**

51.     On March 6, and again on March 11, Detective Marchman showed TT various "Parole photographs of sex offenders assigned to the 46th Precinct as well as sex offenders that fit the description [she provided]."  TT did not identify anyone from the photographs.  Police did not preserve, photograph, or make a record of which photographs or arrays of photographs were shown to TT.  No information about the photographs shown to TT was ever provided to Mr. Hicks.

**An Uncorroborated Tip Leads to the Identification and Arrest of Tyrone Hicks.**

52.     On March 13, 1998 Detective Catalano told Detective Marchman a "source" had called in a tip alleging Mr. Hicks resembled the poster.  On information and belief, the source or tipster did not provide any additional information linking Mr. Hicks to the crime.

53.     On information and belief, police officers did not inquire whether the tipster had a motivation other than or in addition to receipt of reward money for informing the police that the sketch resembled Mr. Hicks.  On information and belief no information about the tipster was provided to the Office of the District Attorney.

53.     On information and belief, the tipster was provided with a reward after Mr. Hicks was convicted.

54.     On March 16, 1998 Marchman obtained a photograph of Tyrone Hicks.  On information and belief the photo was current as Mr. Hicks was then on parole and had been placed on parole for a drug sale for only three months prior to his arrest for the rape of TT.  Mr. Hicks was 41 years old and not bald.

55. Had Detective Marchman investigated Tyrone Hicks' background, he would have learned that Mr. Hicks' prior arrests were for possession and sale of small amounts of narcotics. Mr. Hicks was never arrested or charged with a crime of violence or a crime involving a sexual assault. However, on information and belief, Detective Marchman conducted no investigation regarding Mr. Hicks.

56. Instead, Detective Marchman took Mr. Hicks' photograph to TT and showed her Mr. Hicks' photograph along with "approximately 12 [other] photos." On information and belief, Detective Marchman told TT that a credible tipster – perhaps even a family member - suggested Mr. Hicks was the person depicted in the sketch she had created. On information and belief, Detective Marchman told TT that Mr. Hicks was on parole. TT identified Mr. Hicks from the photographs.

58. New York State law requires preservation of photo arrays so that courts may review the suggestiveness of identification procedures. When a photographic array is not preserved, courts presume the array to have been suggestive, and require the state to rebut that presumption before a complainant's identification will be admitted before the jury. See *People v. Galletti*, 239 A.D.2d 598 (2nd Dept. 1997), and *People v. Robinson*, 123 AD3d 1062 (Second Dept. 2014) among many other cases.

59. Contrary to the law, however, Detective Marchman did not make a record of the photographs he showed to TT. He did not preserve copies of the various arrays. He did not keep a copy of the photograph of Mr. Hicks that he showed to TT. In fact, police destroyed all evidence and documentation of the identification procedures before the pre-trial hearings on the question of the admissibility of the identification.

60.     Moreover, police did not inform the Bronx District Attorney that they gave TT information about the tipster and Mr. Hicks' parole status.  In fact, the police told the District Attorney that the tipster was Mr. Hicks' mother.  The papers reported that Mr. Hicks' parents had called in the tip. That was a total fabrication.

61.     After the so-called identification, Detective Marchman arrested Mr. Hicks.

**Police Placed Mr. Hicks in Multiple Line-ups.**

61.     Police placed Mr. Hicks in at least three line-ups because they believed he was "the Bronx Rapist" who had committed other sex crimes against women in the Bronx.

62.     TT was the only victim to identify Mr. Hicks as a perpetrator.  The other individuals who viewed the line-up in which Mr. Hicks was placed said that he was not the person who raped them.

63.     Information about the non-identification of Mr. Hicks was not disclosed to Mr. Hicks, or to his counsel, or to the District Attorney.  No police reports document the non-identification of Mr. Hicks by other victims of crimes similar to the crime endured by TT.

**Police Believe They Have Arrested the Bronx Rapist and Falsely Report that Mr. Hicks Bragged He was the Bronx Rapist.**

64.     Police falsely reported to the Office of the District Attorney that Mr. Hicks bragged he was the "Bronx Rapist."  That was also a total fabrication.  In fact it was the police who believed Mr. Hicks was the "Bronx Rapist."  Mr. Hicks has always protested his innocence of the attack on TT.

65.     Police believed they had arrested the "Bronx Rapist" despite the fact that the two sexual assault victims who viewed the line-up without having first seen the suggestive photographic arrays declared that he was not the rapist.

66.     Mr. Hicks denied having committed the assault against TT or anyone else, and never identified himself as a rapist.

67.     Tyrone Hicks was charged with rape. He was arraigned and his family was able to post bail after he spent several days in pre-trial custody with a suicide watch.


**POLICE DESTROY EXCULPATORY EVIDENCE: THE FIRST NOTE.**

68.     On March 11, 1998 less than three weeks after she was attacked and several days before Mr. Hicks was arrested, TT informed police that someone slipped a threatening message written on a torn piece of brown paper under her apartment door.

69.     On the paper, someone had written in large block letters, likely using a pencil, "I know where you are. I will put you to sleep. Remember."

70.     Because the language in the note was similar to the language the perpetrator used during the crime, police concluded the perpetrator left the note.

71.     Detective Sheptuk and the crime scene unit inspected and photographed TT's apartment door.  They obtained a latent fingerprint from TT's doorframe.

72.     Detective Cruz Ortiz Police packaged and delivered the note to the police lab so that it could be processed for prints and subjected to handwriting analysis. No prints were lifted from the paper.  Police also installed a "peep hole" camera and caller I.D. at TT's residence.

73.     After arrest, Mr. Hicks requested that his handwriting be compared to the handwriting on the note. However, the police made that comparison impossible. The powder

used to look for fingerprints destroyed the graphite lettering. As a result Mr. Hicks was prevented from showing the jury he did not write the note.

74.     On information and belief, after his arrest, police compared Mr. Hicks' fingerprints to the print lifted from TT's doorway. On information and belief, the print excluded Mr. Hicks as the source of the fingerprint on TT's door.

75.     Police did not disclose to Mr. Hicks, to his counsel, or to the District Attorney the fact that the print excluded Mr. Hicks.

**POLICE FAIL TO DISCLOSE EXCULPATORY EVIDENCE: THE SECOND NOTE.**

76.     Post-conviction, Mr. Hicks wrote to Pace Law School's Post-Conviction Project, where Assistant Professor and Supervising Attorney, Adele Bernhard accepted the case and began representing Mr. Hicks.  Adele Bernhard contacted Assistant District Attorney Andrew Holland in the Office of the Bronx District Attorney.  Searching through the prosecution files, ADA Holland found a second note.  This note was not disclosed to Mr. Hicks, or to his counsel pre-trial or at trial.  It was not in the original trial file.

77.     The second note looks similar to the first.  The lettering was composed entirely of large block letters, likely made with graphite, scratched onto brown paper – the kind of paper used to make grocery shopping bags. The note was threatening.

78.     A contemporaneous police report discovered with the second note establishes that police discovered the second note on April 23, 1998, five weeks after Mr. Hicks' arrest. Detective Lynch interviewed TT about discovery of this second note.

79.     Officer Moore and Supervising Lieutenant Brothers prepared a complaint report alleging witness tampering based on discovery of the note and the information provided by TT

and reported by Detective Lynch. The officers noted that the tampering incident was related to another case being handled by Detective Marchman of the Special Victims unit, and referenced the complaint number under which the TT's rape was lodged.

80.     Since this second note was not disclosed to Mr. Hicks and because he was not aware that it existed, he was unable to argue that he did not write or leave it under TT's door. He was unable to establish an alibi for the time that the note was slipped under TT's door. He was unable to compare his handwriting to the writing on the note. He was unable to request forensic testing of the note.

## AT TRIAL THE JURY CREDITS TT'S IDENTIFICATION AND CONVICTS TYRONE HICKS.

81.     Trial began on October 13, 1999 before Justice Lawrence Bernstein. TT's testimony was the only evidence of Mr. Hicks' guilt.  She described the crime and identified Mr. Hicks as the perpetrator.  Mr. Hicks, however, bore no resemblance to the perpetrator she described.

82.     Right after the attack, TT told police that the perpetrator was a large-in-build Black man, approximately 5'11" tall, about 25 years old, with a bald head, a mustache and a pock-marked face.  She was 27 at the time.

83.     As she testified at trial, she began to recall the attacker as closer to her height and weight.  She agreed the perpetrator was just a bit taller than she – perhaps between 5'8" and 5'10" and that he might have weighed only between 160 and 170 pounds.

84.     However, on March 18, 1998, when he was arrested, Mr. Hicks was a much larger and much older man than the person TT described at any time.  He stood 6' 2" tall and he weighed 210 pounds.  He was 41 years old.  Moreover, he did not have a mustache.  He did not have a pock-marked face.  He was not bald. Mr. Hicks is afflicted with Alopecia Areata (Spot

Baldness or Patch Baldness) – an obvious and unique physical condition that the trial judge described.

85.     Post-trial, Justice Bernstein wrote, "[I]t was apparent that the defendant had a bald patch on the top right side of his head approximately six to seven inches above his right ear in an oval or heart shape approximately three inches wide and three inches in height." Alopecia Areata leaves bald patches unevenly distributed on the afflicted person's cranium. The patches create a distinct and unique look - very different from a bald head.

86.     Arresting police officers described Mr. Hicks's head hair as "short." They did not describe him as bald. In a newspaper photograph taken at Mr. Hicks's arrest it is possible to see his hair-line.

87.     Had the police considered Mr. Hicks' non-violent record, and his appearance -- so different from TT's description of the attacker provided immediately after the crime -- in conjunction with the non-identification by other victims who police believed were assaulted by the same man, and the total lack of forensic or any other direct or circumstantial evidence connecting Mr. Hicks to the assault on TT, police would have realized Mr. Hicks was not TT's attacker. Police would have realized they lacked probable cause to arrest him for rape.

88.     At trial, the state produced no other evidence, direct or circumstantial, connecting Mr. Hicks to the crime. No forensic evidence linked Mr. Hicks to the assault. Mr. Hicks made no incriminating statements, and his conduct was always consistent with innocence. He unswervingly denied the charges.

89.     Mr. Hicks called alibi witnesses to establish he was elsewhere when the crime was committed. His son-in-law and grandfather both testified on his behalf.

16

90.     Although the jury was convinced beyond a reasonable doubt that Ms. Teal was correct when she identified Ms. Hicks as the man who raped her, other stakeholders assessed TT's credibility less favorably.  Mr. Hicks' parole officer declined to violate Mr. Hicks' parole after interviewing TT.  Mr. Hicks remained at liberty on bail awaiting and during trial.  At sentencing Justice Bernstein worried that this was "a case where it could be a possibility of a mistake."

91.     On June 15, 2000 Justice Bernstein sentenced Mr. Hicks to serve eight years in state prison on each of the two counts, running concurrently.  He was remanded.

92.     Mr. Hicks was transferred from the local jail facility to the New York State Department of Correctional Services on July 6, 2000, and was continuously incarcerated serving his sentence until his release on July 11, 2007.


**THE FORENSIC EVIDENCE COLLECTED AT THE CRIME SCENE LEADS TO POST-CONVICTION DNA EXCLUSION AND EXONERATION.**

93.     TT struggled with her attacker when he tried to rape and sodomize her.  She resisted with her hands. Traces of the perpetrator's skin cells were lodged under her fingernails.

94.     Post-conviction, the dowel used to scrape under TT's nails was located and as a result of improved technology, the Chief Medical Examiner of the City of New York was able to conduct DNA testing of the biological material on the dowel in 2010.  Male DNA was scientifically identified in the material scraped from both hands.

95.     Tyrone Hicks agreed to provide a blood sample for comparison with the DNA found in the crime scene scrapings.  Tyrone Hicks was conclusively excluded as the contributor.  On information and belief, Tyrone Hicks' DNA profile was at that time compared

17

to DNA from all the other unsolved sex crimes thought to have been committed by the "Bronx Rapist." He was excluded from all those comparisons.

96.     Justice Clark held that the DNA exclusion necessitated overturning Mr. Hicks' conviction. In her decision, Justice Clark wrote: "the DNA found underneath [TT's] fingernails may be viewed as a particularly powerful piece of evidence, especially where the identity of her attacker was the primary issue at trial."

97.     In affirming Justice Clark's decision, the Appellate Division First Department determined: "The [trial] court concluded that the victim's trial testimony about her strenuous physical struggle with her attacker supported defendant's contention that the DNA material from the victim's fingernails likely came from her attacker. DNA from a victim's fingernails is a recognized forensic tool in identifying attackers, eliminating suspects and investigating crimes (internal citations omitted)," 114 AD3d 599, 981 NYS2d 81 (2014).

98.     On May 15, 2014 the People moved to dismiss the charges against Mr. Hicks and the Justice Moore of the Bronx Supreme Court granted the motion and dismissed all charges against Mr. Hicks.

## DAMAGES

99.     From July 7, 2000 until July 2007 Tyrone Hicks was confined in the custody of the State of New York or its agents.

100.    From June 21, 2007 until October 5, 2012 Tyrone Hicks was forced to register in New York and in South Carolina as a sex offender.

101.    The injuries and damages sustained by Tyrone Hicks, arising from his unjust conviction and imprisonment, include but are not limited to the following: personal injuries; pain and suffering; severe mental anguish, made worse because of his mental disability which

increased his confusion and frustration over his wrongful conviction; exacerbation of underlying mental illness; emotional distress, particularly severe because of the nature of the crimes for which Mr. Hicks was wrongly convicted, in that the other prisoners picked on him because of the nature of the crime for which he was wrongly convicted; extreme fear of being hurt by guards and inmates; actual infliction of injury by other inmates because of the nature of the charges for which he was convicted; physical illness and injury resulting from his confinement and lack of medical care and adequate protection; inadequate medical care; humiliation, indignities, and embarrassment; degradation; egregious injury to reputation; permanent loss of natural psychological development; and restriction on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, psychological counseling, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment and expression. As a direct result of his unjust conviction and imprisonment, Mr. Tyrone Hicks incurred physical and psychological disability that will plague him for the rest of his life.

102.    Additionally, Mr. Hicks and his family incurred significant out-of-pocket expenses throughout the criminal process, including, without limitation, paying substantial fees for his legal representation at trial and on direct appeal.

103.    Mr. Hicks can never regain the seven years of his life during which he was wrongfully incarcerated.  All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.  Damages at this time are estimated as $10,000,000.00.

## FEDERAL CLAIMS

### COUNT I

### 42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution, False Arrest and False Imprisonment

104.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

105.    Defendants Marchman, Catalano, Lynch and John and Jane Doe police officers, with malice and knowing that probable cause did not exist to arrest Mr. Hicks and prosecute him for the rape of TT, acting individually and in concert, caused Mr. Hicks to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Hicks' clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

106.    Specifically, the defendants, acting individually and in concert, fabricated evidence through suggestive investigation procedures and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Mr. Hicks, including but not limited to the fact that the identifications of Mr. Hicks were the product of unduly suggestive identification procedures and/or direct suggestion.  The defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and in light of the fact that Mr. Hicks did not match the description given by the victim of the perpetrator and had no criminal history to suggest that he would have committed a sexual assault, and in light of the fact that other victims of similar crimes thought to have been committed by the same person did not identify Mr. Hicks as their assailant.

20

107.    The defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Hicks' clearly established constitutional rights.  No reasonable officer in 1983 would have believed this conduct was lawful.

108.    As Mr. Hicks has always stated, from the time of his arrest and throughout seven years of wrongful incarceration, and more years registered as a violent sex offender, he is innocent of the TT rape.  The prosecution finally terminated in Mr. Hicks' favor on May 15, 2014 when the indictment was dismissed.

109.    As a direct and proximate result of defendants' actions Mr. Hicks was wrongly convicted and imprisoned for over seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II

**42  U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Conducting Unduly Suggestive Identification Procedures, Withholding and Destroying Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

110.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

111.    Defendants Marchman, Catalano, and John and Jane Doe police officers, acting individually and in concert deprived Mr. Hicks of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial by:

      a.     intentionally using unduly suggestive identification procedures and/or direct suggestion to obtain the witness identification; and/or

      b.     fabricating inculpatory evidence; and/or

c.      withholding material exculpatory and impeachment evidence from prosecutors; and/or

d.      deliberately failing to conduct a constitutionally adequate investigation.

112.    The defendants committed these acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Hicks' clearly established constitutional rights.  No reasonable officer in 1983 would have believed this conduct was lawful.

113.    As Mr. Hicks has always stated, from the time of his arrest and throughout seven years of wrongful incarceration and additional years of post-release supervision, he is innocent of the TT rape.  The prosecution finally terminated in Mr. Hicks' favor on May 15, 2014, when the indictment was dismissed.

114.    As a direct and proximate result of defendants' actions Mr. Hicks was wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III

## 42 U.S.C. § 1983 Failure to Intercede

115.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

116.    By their conduct and under color of state law, defendants Marchman, Catalano, Lynch, and John and Jane Doe police officers had opportunities to intercede on behalf of Mr. Hicks to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

117.    The defendants' failures to intercede violated Mr. Hicks' clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1983 would have believed that failing to intercede to prevent the defendants from fabricating inculpatory evidence, conducting unduly suggestive identification procedures and/or using direct suggestion to procure identifications, withholding and/or destroying material, exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Hicks to be arrested and prosecuted without probable cause were lawful.

118.    As Mr. Hicks has always stated, from the time of his arrest and throughout seven years of wrongful incarceration and additional years of post-release supervision, he is innocent of the TT rape.  The prosecution finally terminated in Mr. Hicks' favor on October 6, 2006, when the indictment was dismissed.

119.    As a direct and proximate result of the defendants' failures to intercede Mr. Hicks was wrongly convicted and imprisoned for over seven, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Civil Rights Conspiracy

120.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

121.    Defendants Marchman, Catalano, Lynch, and John and Jane Doe police officers,, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Hicks of his

23

clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable

searches and seizures, false arrest, false imprisonment, fabrication of evidence and deprivation

of liberty without due process of law, and to a fair trial.

122.    In furtherance of the conspiracy each defendant engaged in and facilitated

numerous overt acts, including, without limitation, the following:

        a.    Falsely arresting and imprisoning Mr. Hicks, knowing they lacked probable cause.

        b.    Fabricating inculpatory evidence in reports and pretrial communications with the prosecution, in that they failed to reveal the suggestive communications with TT resulting in her incorrect identification of Mr. Hicks, (to wit: Detective Marchman deliberately fabricated evidence by suggesting to TT that Mr. Hicks was her attacker; and he failed to document and disclose material exculpatory evidence to prosecutors, including the fact that TT failed to identify Mr. Hicks when she first viewed his photograph);

        c.    Defendant Marchman committed perjury during hearings and trials, which perjury reveals that he understood that he intentionally created a suggestive photographic procedure, conducted an inadequate investigation and  lacked probable cause for Mr. Hicks' arrest.

        d.    Defendants intentionally or with deliberate indifference failing to comply with their duty to disclose Brady material during the pendency of the case, including by destroying material exculpatory evidence, and failing to disclose exculpatory evidence.

123.    As Mr. Hicks has always stated, from the time of his arrest and throughout seven

years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally

terminated in Mr. Hicks' favor on May 15, 2014, when the indictment was dismissed.

124.    As a direct and proximate result of defendants' conspiracy and actions in

furtherance of the conspiracy, Mr. Hicks was wrongly convicted and imprisoned for over seven

years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V

### State Law False Arrest, Malicious Prosecution, and False Imprisonment

127.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

128.     Defendants City of New York, Detectives Marchman, Catalano, and Lynch, and John and Jane Doe police officers, despite knowing that probable cause did not exist to arrest and prosecute Mr. Hicks for the rape of TT, intentionally, recklessly, and with malice caused Mr. Hicks to be arrested, prosecuted, and convicted for the rape of TT.  Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. Hicks, including but not limited to the facts that the identification of Mr. Hicks was the product of unduly suggestive identification procedures and/or direct suggestion, and that the police had fabricated inculpatory evidence and withheld exculpatory evidence.

129.     As Mr. Hicks has always stated, from the time of his arrest and throughout seven years of wrongful incarceration, he is innocent of the TT rape.  The prosecution finally terminated in Mr. Hicks' favor on May 15, 2014, when the indictment was dismissed.

130.     The defendants concealed from Mr. Hicks – and are still concealing today – the facts vitiating probable cause to arrest and prosecute Mr. Hicks. As a direct and proximate result of defendants' actions, Mr. Hicks was wrongly prosecuted, convicted and imprisoned for over seven years and suffered the other grievous and continuing damages and injuries set forth above.

131.     Defendants' conduct, described above, also violated Mr. Hicks' rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

132.     As Mr. Hicks has always stated, from the time of his arrest and throughout seven years of wrongful incarceration, he is innocent of the TT rape.  The prosecution finally terminated in Mr. Hicks' favor on May 15, 2014 when the indictment was dismissed.

133.     As a direct and proximate result of defendants' actions, Mr. Hicks was wrongly imprisoned for over seven years and suffered the other grievous and continuing damages and injuries set forth above.

134.     Defendant City of New York is liable under respondeat superior for the actions of its employees within the scope of employment.

135.     As a direct and proximate result of defendants' actions, Mr. Hicks was wrongly imprisoned for over seven years and suffered the other grievous and continuing damages and injuries set forth above.

136.     Defendant City of New York is liable under respondeat superior for the actions of its employees within the scope of employment.

**WHEREFORE,** Tyrone Hicks prays as follows:

A.   That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which he may be entitled.


Respectfully submitted

_____
Adele Bernhard, Esq.

14 Remsen St.
Brooklyn, NY 11201
917-648-4035
Adele.bernhard@nyls.edu
*Attorney for Plaintiff*