```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/7/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TYRONE HICKS,

                              *Plaintiff*,

          V.

THE CITY OF NEW YORK, DETECTIVE
MICHAEL MARCHMAN, DETECTIVE
CATALANO, DETECTIVE LYNCH, AND
JOHN AND JANE DOES

                              *Defendants*

------------------------------------------------------------X

15-CV-04888 (PAC)


**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff TYRONE HICKS ("Hicks") was convicted in 1999 in Bronx Supreme Court of attempted rape and attempted sodomy of a woman, "T.T."[1]  He was sentenced to eight years and served his time.  Four years after his release, however, Hicks' conviction was vacated; he had been exonerated by exculpatory DNA evidence.

At Mr. Hicks' trial, T.T. was the central witness; she identified Mr. Hicks as her assailant.  Mr. Hicks asserts (as he did throughout his criminal proceedings) that the New York Police Department (NYPD) used improper lineup and identification procedures which led to T.T.'s identification and his subsequent wrongful conviction.  He seeks $10 million in damages.

Perhaps Mr. Hicks should be compensated by some public entity for the eight years of his life he lost due to his conviction.  But who is to be held responsible; on what theory; and which public entity should pay?  No member of the grand jury which indicted him; nor the Bronx

---

[1] For privacy, the victim's name is omitted.  The Court refers to the victim as "T.T." and has accordingly altered any quotations of the parties' submissions containing references to "TT."

1

Assistant District Attorneys who prosecuted him; nor the jurors who convicted him; nor the

judge who conducted pre-trial hearings and the trial; nor the appellate judges who reviewed and

affirmed Mr. Hicks' conviction can be held accountable – all are immune from suit.[2]

Instead Mr. Hicks brings this 42 U.S.C. § 1983 action against Defendants the City of

New York, three NYPD Detectives (Marchman, Catalano, and Lynch), and John and Jane Does.

But it appears anomalous to hold the police officers responsible for an erroneous conviction, in

the absence of any constitutional or other federal law violations, when all of those who initiated,

and subsequently prosecuted, the case against Mr. Hicks are immune from liability.

Mr. Hicks alleges five claims: Malicious Prosecution (**Count I**), Denial of Fair Trial

(**Count II**), Failure to Intercede (**Count III**), and Civil Rights Conspiracy (**Count IV**); and State

Law Malicious Prosecution (**Count V**).[3]

Defendants the City of New York and Det. Marchman ("Marchman") (collectively,

"Defendants")[4] move to dismiss all claims with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).[5]

The motion is GRANTED.

---

[2] *See, e.g.*, <u>Van de Kamp v. Goldstein</u>, 555 U.S. 335, 343 (2009) (absolute immunity applies to prosecutors acting as officers of the court); <u>Imbler v. Pachtman</u>, 424 U.S. 409, 423 (1976) (grand jurors acting within scope of duty are entitled to common-law immunity); <u>White v. Hegerhorst</u>, 418 F.2d 894, 895 (9th Cir. 1969), *cert. denied*, 398 U.S. 912 (1970) (juror in criminal trial immune from subsequent civil action for damages); <u>Pierson v. Ray</u>, 386 U.S. 547, 554–55 (1967) (describing the "well established" immunity "of judges for acts within the judicial role").

[3] The Complaint also alleges False Arrest claims, but Mr. Hicks now concedes that these claims are time-barred. ECF 14 at 6. The Complaint also alleges False Imprisonment claims, but Mr. Hicks does not mention these claims. The Court assumes that these claims are abandoned, as "[t]he common law tort of false arrest is a species of false imprisonment," <u>Singer v. Fulton Cnty. Sheriff</u>, 63 F.3d 110, 118 (2d Cir.1995), and "[u]nder New York law, the elements of a false arrest or false imprisonment case are the same." <u>Angevin v. City of New York</u>, No. 10-CV-5327 (SLT/SMG), 2016 WL 4661011, at *6 (E.D.N.Y. Sept. 6, 2016).

[4] Defendants assert that their arguments equally apply to Detectives Catalano and Lynch, but they have not been served; and have yet to appear. ECF 29 at 1.

[5] The moving papers cite Rules 12(b)(6) and 12(c); the pleading standards for each motion, however, are the same. *See* <u>Patel v. Contemporary Classics of Beverly Hills</u>, 259 F.3d 123, 126 (2d Cir. 2001).

The allegations are insufficient to support any of the five claims.  The allegations concerning the malicious prosecution claim (**Counts I** and **V**) are not sufficient to overcome the presumption of probable cause to prosecute created by Mr. Hicks' grand jury indictment.  The claim of denial of a fair trial (**Count II**) fails for several reasons.  First, the prosecutors and the judge who conducted pre-trial <u>Wade</u> and independent source hearings were aware of, and not misled by, the photo array and line-up identification procedures used with T.T.; thus, the prosecutors' decision to continue prosecution and/or the judge's determination to permit T.T.'s line-up and in-court identifications at trial constituted superseding causes that severed any liability of the officers.  Accordingly, the claim cannot rest on any alleged suggestive identification procedures or fabricated evidence in the form of a manufactured identification.  Second, none of the alleged <u>Brady</u> violations support a denial of fair trial claim.  Neither the analysis results of a latent fingerprint obtained from T.T.'s doorframe nor other sexual assault victims' "non-identifications" of Mr. Hicks were suppressed, as Mr. Hicks' counsel knew of the essential facts regarding this evidence.  The absence of proof here is not exculpatory.  Further, the officers turned over a second threatening note to the Bronx District Attorney's Office, and thus cannot be liable under <u>Brady</u> for its failure to be disclosed to Mr. Hicks.  Third, there is no constitutional right to an "adequate investigation."  The failure to intercede claim (**Count III**) fails as Mr. Hicks does not present any specific facts showing that any officer failed to intercede in his arrest and prosecution, nor does he allege that any officer was aware of any constitutional violations other than those that the officer himself is alleged to have committed.  Finally, the civil rights conspiracy claim (**Count IV**) must be dismissed as Mr. Hicks does not plead facts demonstrating an agreement between any defendants to deprive him of his rights, and even if he

had, the intracorporate conspiracy doctrine would bar liability as no facts demonstrate that any alleged conspiring officers acted due to an improper personal motivation.

## I.   Legal Standard

In considering a motion to dismiss, a court accepts a complaint's factual allegations as true and draws all inferences in Plaintiff's favor. *See* McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  A court must only "'assess the legal feasibility of the complaint, not [] assay the weight of the evidence which might be offered in support thereof.'" GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Funds, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)).  But the factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  Thus, a pleading must allege more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action;" facts "merely consistent with a defendant's liability" are insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555) (internal quotations and citations omitted).

In considering a Rule 12(b)(6) motion to dismiss, a court may consider documents referenced in the complaint, documents relied on by the plaintiff in bringing the action and are either in plaintiff's possession or of which plaintiff knew when bringing suit, or matters of which judicial notice may be taken. Shabazz v. Kailer, No. 15-CV-2798 (JGK), 2016 WL 4258134, at *1 (S.D.N.Y. Aug. 12, 2016); Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002). Thus, a court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." In re Bristol-Myers Squibb Secs. Litig., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).

## II.     Background

The Complaint's factual allegations are taken as true. [6]

In the early morning hours of February 23, 1998, a man attempted to rape T.T., a 27-year-old female, while she was standing in front of an apartment building at 2303 Valentine Ave., Bronx, NY; he threatened to "put her to sleep," while squeezing her throat. Compl. at ¶¶ 24–26, 30. T.T.'s vigorous resistance attracted tenants' attention, one of whom called 911 and described the perpetrator as "male, black . . . bald, with a mustache." *Id.* at ¶¶ 27–29. The perpetrator ran away, and T.T. described him to responding police as "male/black, large-in-build . . . between 5'11" and 6'0" tall[,] 25 years old[,]" with a "bald head and mustache" and a "'pocked mark' face." *Id.* at ¶ 30. T.T. was taken to a hospital where technicians collected biological material from underneath her fingernails, which she had used to resist her attacker. *Id.* at ¶¶ 31–32. At this time, however, the amount was insufficient to test for DNA. *Id.* at ¶ 32.

Later that morning, Marchman brought T.T. to the "CATCH" unit to review photographs. *Id.* at ¶ 34. Marchman directed the CATCH officer to select and show T.T. photographs of "large-in-build black men arrested in the 46th precinct" for any crime within the past six years. *Id.* at ¶ 35. If his directions were followed, the selection would have included Hicks, as he was convicted of drug offenses within that time period. *Id.* at ¶ 36. But Marchman later "false[ly] and misleading[ly]" testified at a pre-trial hearing that Hicks' photograph was "definitely not in

---

[6] The Court also has considered facts contained in Defendants' motion papers, such as police reports, excerpts from the pre-trial Wade and independent source hearings held in May and June, 1999, and trial transcript portions. *See* ECF 28; Shabazz, 2016 WL 4258134, at *1. Initially, Mr. Hicks argued against consideration of these documents, but subsequently conceded that consideration is proper; indeed, it would be difficult to address a malicious prosecution claim without considering the case giving rise to the claim. *See* Oral Arg. Tr. 20:25 –21:4, Dec. 13, 2016, ECF 37. In any event, plaintiff's Complaint alleges that it is "based in part on the testimony provided by T.T. at a pre-trial hearing, at trial, at the post-conviction C.P.L. 330 hearing, and on information contained in police reports" and references Marchman's testimony. Compl. at ¶ 24 n.2, ¶¶ 38–41.

5

the group of photographs T.T. viewed," despite admitting that "he did not select . . . [nor] view

the photographs," and "was only in the room with T.T. intermittently, and thus would have had

no way to ascertain what CATCH photographs T.T. saw." *Id.* at ¶¶ 38–39, 41.  T.T. did not

identify anyone from these photographs as her assailant.[7]  *Id.* at ¶ 37.  This CATCH photo array

was not preserved.  *Id.* at ¶ 40.

On February 27, 1998, T.T. helped a police artist create a sketch of her attacker,

subsequently enlarged into a poster, that showed "a bald man with a round face and distinctively

narrow eyebrows . . .  and note[d] that the perpetrator was between 30-35 years old, 5'11", 200

pounds, and bald."  *Id.* at ¶ 43.

Police were concurrently investigating two other rapes that had occurred around the same

time and in the same area, which they believed T.T.'s attacker, referred to as the "Bronx Rapist,"

had also committed.  *Id.* at ¶¶ 45–50; *see* ECF 28, Ex. I at 318:11–13.

On March 6 and 11, 1998, Marchman showed T.T. additional photo arrays from which

she did not identify anyone as her assailant.  Compl. at ¶ 51.  These photo arrays were not

preserved.[8]  *Id.*

On March 11, 1998, T.T told police that someone had left a note under her apartment

door, written in pencil on torn brown paper, threatening: "I know where you are.  I will put you

to sleep.  Remember."  *Id.* at ¶¶ 68–69.  As this language was similar to that used by T.T.'s

assailant during her attack, police determined that the attacker had left the note.  *Id.* at ¶ 70.  The

---

[7] Marchman allegedly did not inform the Office of the Bronx District Attorney "that Mr. Hicks' photograph was likely viewed and rejected by T.T," Compl. at ¶ 42, but the subject was discussed at a pre-trial hearing.  The judge stated: "[i]f there are hundreds of photographs in the computer [T.T.] viewed then the fact that she did not make a photo ID is of little significance."  ECF 28, Ex. B at 132:8–11.

[8] Hicks alleges that Defendants never provided him any information about these arrays, but Hicks' counsel cross-examined Marchman during a pre-trial hearing regarding the March 6, 1998 array.  Compl. at ¶ 51; ECF 28, Ex. B at 41:2–7.

police checked the paper note for fingerprints, but that procedure "destroyed the graphite lettering." *Id.* at ¶ 73. This precluded any handwriting analysis. *Id.* Thus, Hicks "was prevented from showing the jury he did not write the note."[9] *Id.* Detectives obtained a "latent fingerprint" from T.T.'s doorframe that purportedly did not match Hicks' prints. *Id.* at ¶¶ 71, 74. Police failed to disclose the exclusionary results, *see id.* at ¶ 75, but at least by the time of trial, Hicks' counsel possessed a police report "that noted that a fingerprint was lifted from [T.T.'s] door and that it was being sent for analysis." ECF 29 at 20.

On March 13, 1998, Detective Catalano informed Marchman that a "source" had "called in a tip alleging Mr. Hicks resembled the poster." Compl. at ¶ 52. "[N]o information about the tipster was provided to the Office of the [Bronx] District Attorney" (hereinafter, the "Prosecutors"). *Id.* at ¶ 53. Defendants told the Prosecutors that "the tipster was Mr. Hicks' mother," which was a "total fabrication." *Id.* at ¶ 60. Newspapers later reported that the Hicks' "parents had called in the tip." *Id.*

On March 17, 1998, Marchman showed T.T. twelve photographs, including one of Hicks, despite "conducting no investigation regarding Mr. Hicks," who had been placed on parole approximately three months prior for selling drugs and had never been arrested nor charged with a sexual assault or violent crime. *Id.* at ¶¶ 54–56. Due to Hicks' parole status, the photograph was current and would have depicted Hicks as 41 years old and not bald. *Id.* at ¶ 54. Marchman allegedly told T.T. "that a credible tipster – perhaps even a family member – suggested Mr. Hicks was the person depicted in [her] sketch . . . [and that he] was on parole." *Id.* at ¶ 56. Marchman did not tell the Prosecutors that he had given T.T. this information. *Id.* at ¶ 60. T.T. subsequently selected Hicks' photo. *Id.* at ¶ 56. This photo array was not preserved nor

---

[9] The note does not appear to have been introduced at trial. *See* Oral Arg. Tr. at 36:7–13.

recorded; Hicks alleges that "police destroyed all evidence and documentation of the identification procedures." *Id.* at ¶¶ 58–59.

Subsequently, T.T., along with two other sexual assault victims, viewed a line-up which included Hicks. *Id.* at ¶ 62; ECF 29 at 4.[10]  The two women "who viewed the line-up without having first seen the suggestive photographic arrays declared that [Hicks] was not the rapist." [11] Compl. at ¶¶ 61–62, 65; ECF 29 at 4.  T.T. identified Hicks as her perpetrator, and Hicks was charged with her attempted rape.  Compl. at ¶ 62; ECF 29 at 4.

Police allegedly "falsely reported" to the Prosecutors that Hicks "bragged he was the 'Bronx Rapist,'" despite Hicks consistently having protested his innocence.  Compl. at ¶ 64.

A grand jury indicted Hicks on April 3, 1998.  ECF 28, Ex. E.

On April 23, 1998, T.T. found a second threating note, similarly written and constructed as the first note, about which Detective Lynch interviewed T.T.  Compl. at ¶¶ 76–78.  This note was found in 2010 in the Prosecutors' files, pursuant to a search requested by Hicks' post-conviction counsel.  *Id.* at ¶ 76; Oral Arg. Tr. at 32:10–16.  It was not in the original trial file and was not disclosed to Hicks or his counsel prior to its discovery in 2010.  Compl. at ¶ 76.  Hicks was thus unable to request a handwriting analysis or forensic testing; provide an alibi for the time during which it was left at T.T.'s apartment; or argue that he did not write nor leave the note.  *Id.* at ¶ 80.  The Prosecutors prepared a report alleging witness tampering.  *Id.* at ¶ 79.

---

[10] Hicks alleges that he was placed in "at least three line-ups because [police] believed he was 'the Bronx Rapist' who had committed other sex crimes."  Compl. at ¶ 61.  This apparently refers to one line-up viewed by three different individuals: T.T. and two other sexual assault complainants.

[11] Defendants allegedly did not document nor disclose these "non-identifications."  Compl. at ¶ 63.  At the May 14, 1999 pre-trial hearing, however, T.T. testified that two other women had also viewed the line-up, ECF 28, Ex. B at 96:25–97:25, 115:7–25, and at trial, Hicks' counsel noted that one victim who had viewed the line-up did not identify Hicks as her perpetrator, and that her perpetrator had not been apprehended.  ECF 28, Ex. I at 318:19–25, 544:19–23.

On May 13, 14, and June 24, 1999, the court held pre-trial <u>Wade</u> and independent source hearings (collectively, the "Pre-Trial Hearings"). *Id.* at ¶ 38; ECF 29 at 4–5. The <u>Wade</u> hearing sought to determine the admissibility of the pre-trial identification procedures used. Compl. at ¶ 38; ECF 29 at 4–5. Marchman testified about the various photos used and the line-up procedures, as well as the sketch. Compl. at ¶¶ 38–40; ECF 29 at 4–5. The judge deemed the March 17, 1998 unpreserved photo array suggestive as a matter of law. ECF 28, Ex. B 112:5–9; ECF 29 at 5. An independent source hearing was then held. *See* ECF 28, Ex. B. at 68–123. T.T. testified about the attack; that Marchman did not tell her anything, other than to review the photo array; and that Defendants did not tell her anything about the individuals in the line-up. ECF 28, Ex. B at 95–97, 112, 115. The judge determined that the sketch was sufficiently similar to Hicks, notwithstanding certain discrepancies, that he could possibly be the perpetrator, and the question of whether T.T. "clearly identified the wrong person" was for the trier of fact to resolve. ECF 28, Ex. B at 147:8–10, 148:12–13; ECF 29 at 5. The judge found (a) T.T. credible; (b) that the line-up was fair; and (c) an independent source for T.T.'s line-up and in-court identifications of Hicks based on her ability to observe her assailant during the attack. ECF 28, Ex. B at 148:17–20, 150:16–21, 152:2–18; ECF 29 at 5. The judge allowed T.T.'s in-court and line-up identifications to be introduced at trial. ECF 28, Ex. B at 152:11–15; ECF 29 at 5.

At Hicks' trial in October 1999, "T.T.'s testimony was the only evidence of Mr. Hicks' guilt." Compl. at ¶¶ 81, 88. Immediately after the attack, T.T. told the police that that her assailant had "a bald head and mustache, . . . was between 5'11" and 6'0" tall; 25 years old; and had a 'pocked mark' face." *Id.* at ¶ 30. At trial, T.T. testified that the perpetrator was "perhaps between 5'8" and 5'10" and that he might have weighed only between 160 and 170 pounds." *Id.* at ¶ 83. Hicks did not match either description; at the time of his arrest, Hicks was "6'2" . . .

weighed 210 pounds . . . 41 years old . . . did not have a mustache . . . [nor] a pock-marked face .

. . not bald . . . [and has] Alopecia Areata," which "leaves bald patches unevenly distributed on

the afflicted person's cranium" that "create a distinct and unique look."  *Id.* at ¶¶ 84–86.  Indeed,

"[a]rresting police officers described Mr. Hick's head hair as 'short' . . . not . . . bald."  *Id.* at ¶

86.  Hicks' son-in-law and grandfather testified as alibi witnesses.  *Id.* at ¶ 89.  Hicks maintained

his innocence throughout, and after a jury convicted Hicks, the sentencing judge "worried that

this was 'a case where it could be a possibility of a mistake.'"  *Id.* at ¶¶ 88, 90; *see* People v.

Hicks, 11 A.D.3d 261 (1st Dep't 2004); aff'd, 6 N.Y.3d 737 (2005).  On June 15, 2000, Hicks

was sentenced to eight years in state prison and was incarcerated until his release on July 11,

2007.  Compl. at ¶¶ 91–92.

In 2007, Hicks began working with the Pace Law School Post-Conviction Project to

establish his innocence.  *Id.* at ¶ 9.  In 2010, the Office of the Chief Medical Examiner used

improved technology to test the small DNA material previously taken from underneath T.T.'s

fingernails, which, compared to Hicks' DNA, "excluded [him] as the contributor."  *Id.* at ¶¶ 94–

95.  Hicks' DNA was similarly compared to and excluded from DNA "from all the other

unsolved sex crimes thought to have been committed by the 'Bronx Rapist.'"  *Id.* at ¶ 95.

On October 5, 2012, the New York Supreme Court granted Hicks' motion to vacate his

conviction on the grounds of newly discovered evidence.  *Id.* at ¶ 10.  The Appellate Division,

First Department affirmed in February 2014, and the Bronx District Attorney's Office moved to

dismiss all charges in May 2014.  *Id.* at ¶ 11; *see* People v. Hicks, 114 A.D.3d 599 (1st Dep't

2014).

Hicks brought his § 1983 action in June 2015.  ECF 1.

III.   **Discussion**

Defendants move to dismiss all claims pursuant to Rule 12(b)(6).

a.   Section 1983 and State Law Malicious Prosecution (Counts I and V)

Malicious prosecution claims against under Section 1983 must allege "a violation of []

rights under the Fourth Amendment, and must establish the elements of a malicious prosecution

claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010)

(internal citations omitted).  A Section 1983 malicious prosecution claim is "substantially the

same" as one under state law,  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003) (internal

quotations and citations omitted), and requires that a plaintiff show: "(1) the initiation or

continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in

plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual

malice as a motivation for defendants' actions." Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir.

1997) (quoting Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)).

*i.   Initiation of Proceeding*

A presumption exists that "[o]nce a criminal defendant has been formally charged, the

chain of causation between the officer's conduct and the claim of malicious prosecution is

broken by the intervening actions of the prosecutor, thereby abolishing the officer's

responsibility for the prosecution." Douglas v. City of New York, 595 F. Supp. 2d 333, 342

(S.D.N.Y. 2009).  Thus "[t]o initiate a prosecution, a[n] [officer] must do more than report the

crime or give testimony.  He must play an active role in the prosecution, such as giving advice

and encouragement or importuning the authorities to act." Manganiello, 612 F.3d at 163

(internal quotations and citations omitted).  Officers that "withhold[] material exculpatory

evidence from the prosecutor, or knowingly creat[e] false information that create[s] the basis for

the prosecution" may be found to have initiated a prosecution.  Stukes v. City of New York, No. 13-CV-6166 (NGG/VPP), 2015 WL 1246542, at *9 (E.D.N.Y. Mar. 17, 2015); see Shabazz, 2016 WL 4258134, at *3.  But even where officers use suggestive identification procedures or coercion, a prosecutor who fully manages the prosecution and investigates the witnesses, and subsequently decides to bring charges, may be a superseding cause.  Bermudez v. City of New York, No. 11-CV-750 (LAP), 2014 WL 11274759, at *8 (S.D.N.Y. Mar. 25, 2014), aff'd in part, 790 F.3d 368, 377 (2d Cir. 2015).

Hicks alleges that Marchman "fabricated evidence through suggestive identification procedures" and intentionally withheld from and misrepresented to the Prosecutors related "exculpatory facts that vitiated probable cause."[12]  Compl. at ¶ 106.  The Prosecutors examined T.T., however, at the Pre-Trial Hearings and determined to continue prosecution, breaking the causation chain and precluding liability of Defendants stemming from use of any alleged suggestive identification procedures.  See Bermudez, 2014 WL 11274759, at *8.

Taking as true Hicks' allegations that Defendants falsely told the Prosecutors that Hicks bragged that he was the "Bronx Rapist" and that Hicks' mother was the tipster, Compl. at ¶¶ 60, 64, the analysis proceeds to the second element.  See Manganiello, 612 F.3d at 163; Stukes, 2015 WL 1246542, at *9.[13]

---

[12] Hicks also claims that Defendants withheld the fact that Hicks' "photograph was likely viewed and rejected by T.T." in the initial CATCH photo session.  Compl. at ¶¶ 42, 106.  But as explained in footnote 6, this subject was extensively explored at a pre-trial hearing in which the Prosecutors participated.  See ECF 28, Ex. B at 132:8–11.

[13] Hicks also alleges that Defendants withheld information regarding the "non-identifications" of Hicks; the results from analysis of the fingerprint from T.T.'s doorframe that excluded Hicks as the source; and the second note found underneath T.T.'s door.  Id. at ¶¶ 71, 74, 75.  But as previously explained, Hicks' counsel was aware of the "non-identifications."  See ECF 28, Ex. B at 96:25–97:25, 115:7–25; ECF 28, Ex. I at 318:19–25, 544:19–23.  Hicks' counsel also knew, at least by the time of trial, that police had lifted and sent for testing a latent fingerprint from T.T.'s door.  See ECF 28, Ex. I at 395:10–20; ECF 28, Ex. J.  Further, the record illustrates that Defendants forwarded the second note to the Prosecutors.  See Compl. at ¶¶ 76–78.

*ii.   Probable Cause for Commencing Proceeding*

Hicks' malicious prosecution claim fails because the factual allegations cannot rebut the presumption of probable cause which flows from the grand jury indictment.

"[T]he existence of probable cause constitutes a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).  A grand jury indictment "creates a presumption of probable cause that can only be overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith." Bermudez, 790 F.3d 368, 377 (2d Cir. 2015) (internal quotations and citations omitted).  "[M]ere conjecture and surmise" are insufficient to rebut the presumption. Savino, 331 F.3d at 73 (internal quotations and citations omitted).  Bad faith may be shown "through evidence that police witnesses have not made a complete and full statement of facts," Newton v. City of New York, 640 F. Supp. 2d 426, 442 (S.D.N.Y. 2009) (internal quotations and citations omitted), or that police "fail[ed] to pursue obvious indications of innocence." Newton v. City of New York, 566 F. Supp. 2d 256, 277 (S.D.N.Y. 2008) (deeming plaintiff's allegation that prosecutors coached witness who failed to identify plaintiff at pretrial hearing, "yet was able to identify him with little difficulty days later at trial," sufficient to "raise the specter of bad faith" and rebut presumption).  But "police officers act in bad faith only when they fail to disclose evidence that would conclusively establish the plaintiff's innocence or negate the possibility that plaintiff had committed the crime." Stukes, 2015 WL 1246542, at *5 (internal quotations and citations omitted).

To rebut the presumption, Hicks alleges that Defendants "fabricated evidence through suggestive investigation procedures and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Mr. Hicks,

13

including but not limited to the fact that the identifications of Mr. Hicks were the product of unduly suggestive identification procedures and/or direct suggestion." Compl. at ¶ 106. Officers' alleged misleading use and "deliberate hid[ing]" of suggestive identification procedures or witness coercion, however, "do[es] not constitute fraud, perjury, or the suppression of evidence" where a prosecutor is able to gain sufficient probable cause through personal observations and interviews of the witness. Bermudez, 2014 WL 11274759, at *10. And that is what happened here. The Prosecutors "fully participated" in the independent source hearing and "elicited testimony from both Detective Marchman and T.T. about the [identification] procedures and any improprieties." ECF 29 at 12. The alleged use of suggestive identification procedures was not withheld. *Id.* To the contrary, "details of the identification, and the ramifications of the lost photograph array were analyzed exhaustively." *Id.*; *see* ECF 28, Ex. B. Finally, the judge determined after hearing all of the Wade and independent source evidence that T.T. could make an in-court identification of Mr. Hicks, and that the ultimate determination of Mr. Hicks' guilt was a question for the jury. ECF 28, Ex. B at 152:11–15; ECF 29 at 5. These were independent judgments by the Prosecutors and the judge to admit the evidence.

Hicks also alleges that Defendants "failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and in light of the fact that Mr. Hicks did not match the description given by the victim of the perpetrator and had no criminal history to suggest that he would have committed a sexual assault, and in light of the fact that other victims of similar crimes thought to have been committed by the same person did not identify Mr. Hicks as their assailant."[14] Compl. at ¶ 106. But failure to pursue alternative avenues of investigation or "possible negligence in failing to discover or forward exculpatory evidence is

---

[14] Hicks cites no specific facts "point[ing] to other suspects." Compl. at ¶ 106.

insufficient to rebut the presumption created by the indictment." Stukes, 2015 WL 1246542, at

*7; *see also* Zahrey v. City of New York, No. 98-CV-4546 (DCP/JCF), 2009 WL 54495, at *17

(S.D.N.Y. Jan. 7, 2009); Panetta v. Crowley, 460 F.3d 388, 396 (2d Cir. 2006) ("[A]n officer's

failure to investigate an arrestee's protestations of innocence generally does not vitiate probable

cause."). Moreover, T.T.'s identification of Hicks carries heavy weight, as "[w]hen information

is received from a putative victim or an eyewitness, probable cause exists unless the

circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65,

70 (2d Cir. 2001).

Hicks' remaining allegations – that Defendants conveyed to the Prosecutors Hicks'

"false brag" and that Hicks' mother was the tipster, and that newspapers reported that Hicks'

parents had called in the identifying tip – taken as true at the pleading stage, do not overcome the

presumption of probable cause created by the grand jury indictment. *See* Savino, 331 F.3d at 73.

### b. Denial of Fair Trial (Count II)

Hicks claims that Defendants violated his constitutional right to a fair trial through use of

unduly suggestive identification procedures, withholding and destroying exculpatory material

and impeachment evidence, fabrication of evidence, and deliberate failure to conduct a

constitutionally adequate investigation.[15]

#### i. *Suggestive Identification Procedures*

Testimony based on suggestive identification procedures may violate the right to a fair

trial. Wray v. City of New York, 490 F.3d 189, 193 (2d Cir. 2007). Normally "a plaintiff cannot

recover for an unduly suggestive identification if there is an intervening cause of his damages . . .

---

[15] "[A] fair trial claim may be brought alongside a malicious prosecution claim, even where both claims are based on
the same allegedly false evidence and the same deprivation of liberty." Hoyos v. City of New York, 999 F. Supp. 2d
375, 392 (E.D.N.Y. 2013).

[but] if [the plaintiff] can demonstrate that the officers coerced eyewitnesses into false accusations and then misled prosecutors (and the court) about the reliability of the identification, he may recover under section 1983." Newton, 566 F. Supp. 2d at 277; *see also* Zahrey v. Coffey, 221 F.3d 342, 351 (2d Cir. 2000); Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999).

Hicks alleges that Defendants used suggestive photo arrays and/or direct suggestion to persuade T.T. "to identify the person they believed was the 'Bronx Rapist' after a tipster focused them on Mr. Hicks," and that her subsequent in-court or line-up identifications resulted in a denial of fair trial.  ECF 36 at 10; *see* Compl. at ¶ 111.  But the Prosecutors were well aware of the problems with the identification procedures Defendants used with T.T., and despite these issues, decided to continue the proceeding: "details of the identification, and the ramifications of the lost photograph array were analyzed exhaustively in the independent source hearing, at which the Assistant District Attorney fully participated and elicited testimony from both Detective Marchman and T.T. about the procedures and any improprieties."  ECF 29 at 12; ECF 28, Ex. B at 16–20.  The Prosecutors were not misled by the alleged suggestive identification procedures. *Cf.* Bermudez, 790 F.3d at 375–76 (holding liability chain intact and determining prosecutor could have been misled by officer's failure to inform prosecutor of use of suggestive identification procedures).

Nor do the allegations support a finding that the alleged suggestive procedures misled the judge who conducted the hearing.  After listening to the Wade evidence, the judge declared the unpreserved photo array suggestive as a matter of law, but determined there was an independent basis for the admission of T.T.'s in-court and line-up identifications.  ECF 28, Ex. B at 152:11–15; ECF 29 at 5; Compl. at ¶ 81; *see* Newton, 640 F. Supp. 2d at 444.

The chain of causation between Defendants and any alleged denial of fair trial based on suggestive identification procedures does not survive the independent decisions of the Prosecutors to continue prosecution or the hearing judge to permit T.T.'s identifications at trial.

ii.   *Alleged Brady Violations*

A Brady violation requires suppression of "evidence favorable to the accused that is material to guilt" that "deprive[d] the defendant of a fair trial."  United States v. Rittweger, 524 F.3d 171, 180 (2d Cir. 2008) (internal quotations and citations omitted).  There must exist "a reasonable probability that the suppression affected the outcome of the case, or would have put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* (internal quotations and citations omitted).  But exculpatory evidence "is not suppressed if the defendant knew, or should have known, of the essential facts permitting him to take advantage of [it]." DiSimone v. Phillips, 461 F.3d 181, 197 (2d Cir. 2006) (internal quotations and citations omitted).  Disclosure of exculpatory evidence to prosecutors satisfies officers' Brady obligations. Walker v. City of New York, 974 F.2d 293, 298–99 (2d Cir. 1992).

Hicks alleges that Defendants violated their Brady violations by failing to disclose (1) the other victims' non-identifications of Hicks; (2) the analysis results of the fingerprint obtained from T.T.'s doorframe; and (3) the second threatening note left under T.T.'s door.  Compl. at ¶¶ 63, 75–76; ECF 36 at 15–17.[16]

---

[16] Defendants also urge the Court to dismiss this claim since Hicks "does not claim that the alleged withholding of evidence, to the extent that it occurred, was the result of intentionally wrongful conduct."  ECF 29 at 21; *see* United States v. Lemon, 1996 WL 20520, at *3 (2d Cir. 1996), cert. denied, 519 U.S. 853 (1996).  While the Complaint may not explicitly extend the allegation of bad faith to the alleged Brady violations, Hicks clearly intended to do so. *See* ECF 36 at 15 ("Defendants purposely kept that information to themselves so that Plaintiff would not understand the significance of the negative identifications and could not use it to build a defense."); *id.* at 16 ("Defendants failed to inform Plaintiff of the exculpatory fingerprint test results, and deliberately misled him about the existence of exculpatory forensic material.").

But here too the record confirms that Hicks' counsel was "aware of the essential facts" regarding the non-identifications. DiSimone, 461 F.3d at 197. At the Pre-Trial Hearings, T.T. testified that police had picked her up with two other women with whom she waited to view the line-up that included Hicks. *See* ECF 28, Ex. B at 96:25–97:25, 115:7–25. Hicks' counsel knew that Hicks was only charged with the attempted rape of T.T.; and that one of the other women who had viewed the line-up had not identified Hicks as her perpetrator. *See* ECF 28, Ex. I at 318:19–25, 544:19–23.

Hicks counsel possessed, at least by the time of trial, a report noting that police had obtained and sent for testing a latent fingerprint from T.T.'s door. *See* ECF 28, Ex. I at 395:10–20; ECF 28, Ex. J. This evidence cannot be said to have been suppressed. DiSimone, 461 F.3d at 197. Moreover, the fingerprint that ultimately did not match Hicks' prints does not constitute exculpatory Brady material. *See* United States v. Sessa, 711 F.3d 316, 321–22 (2d Cir. 2013); Mallet v. Miller, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).

The second threatening note was eventually discovered in the Prosecutors' files. Compl. at ¶ 76. Defendants correctly argue that "[n]o conclusion is possible other than that NYPD personnel turned the note over to [the Prosecutors], meeting their requirements under Brady." ECF 29 at 21; *see* Walker, 974 F.2d at 298–99.

Hicks' denial of fair trial claim thus cannot rest on any alleged Brady violations.

        iii.  *Deliberate Failure to Conduct a Constitutionally Adequate Investigation*

"[T]here is no constitutional right to an adequate investigation." Newton, 566 F. Supp. 2d at 278. "A police officer's failure to pursue a particular investigative path is not a constitutional violation." Schweitzer v. Brunstein, 2016 WL 4203482, No. 16-CV-1172 (RRM) (LB), at *2 (E.D.N.Y. Aug. 9, 2016). Accordingly, the Court need not address this allegation of

an inadequate investigation as a basis for denial of fair trial. The Court also notes that the issue is considered in the malicious prosecution context. *See* <u>Newton</u>, 566 F. Supp. 2d at 278.

iv. <em>Fabrication of Evidence</em>

Courts recognize a constitutional right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer." <u>Coffey</u>, 221 F.3d at 349. A plaintiff must sufficiently allege that "(1) an investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." <u>Jovanovic v. City of New York</u>, 486 Fed. Appx. 149, 152 (2d Cir. 2012). Thus, the alleged fabrication must be material and also the "legally cognizable cause" of the deprivation. <u>Hoyos v. City of New York</u>, 999 F. Supp. 2d 375, 393 (E.D.N.Y. 2013). "Where a police officer deceives subsequent decision makers with false information, the chain of causation need not be considered broken because the officer can reasonably foresee that his misconduct will contribute to the subsequent decisions that result in a deprivation of liberty." <u>Shabazz</u>, 2016 WL 4258134, at *7.

Hicks alleges that Defendants fabricated and forwarded to the Prosecutors his inculpatory admission (the "false brag"); the identity of the tipster; and T.T.'s identification. Compl. at ¶¶ 56, 60, 64; ECF 36 at 9. But no alleged facts show that either the Prosecutors or the hearing judge were deceived. To the contrary, "[t]he jury, the prosecutor, the hearing judge, and the trial judge all had the opportunity to independently decide whether they believe that the sketch sufficiently resembled [Hicks] to support T.T.'s identification." ECF 29 at 18. Thus, Defendants cannot be liable in light of the intervening decisions of the Prosecutors to continue prosecution or of the hearing judge to permit T.T.'s identifications at trial. *See* <u>Wray</u>, 490 F.3d at 195 ("[I]n the absence of evidence that Officer Weller misled or pressured the prosecution or

19

trial judge, he was not an 'initial wrongdoer.'  And if his conduct amounted to a wrong under

state common law or statutory law, it would still not constitute a violation of a federal

constitutional right enforceable under § 1983." (internal citations and quotations omitted)).

> c.   Failure to Intercede (Count III)

"[L]aw enforcement officials have an affirmative duty to intervene to protect the

constitutional rights of citizens from infringement by other law enforcement officers in their

presence."  Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  "Liability may only attach

only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a

reasonable person in the officer's position would know that the victim's constitutional rights

were being violated; and (3) the officer does not take reasonable steps to intervene."  Jean-

Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  Officers that "may be held

liable under a theory of direct participation . . . [may not] be held liable for failure to intervene."

Jackson v. City of New York, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013).  "If the Court

determines that the officer's conduct did not violate a constitutional right, however, the analysis

ends."  Feinberg v. City of New York, 2004 WL 1824373, No. 99-CV-12127 (RC), at *4

(S.D.N.Y. Aug. 13, 2004).

Hicks asserts that "[d]iscovery will reveal which of the officers involved in the arrest and

investigation of [his] prosecution knew how his rights were being violated and should have

interceded."  ECF 36 at 24.  These allegations do not "raise a right to relief above the speculative

level" that any one of Defendants failed to intercede.  Twombly, 550 U.S. at 555.  Moreover,

Defendants correctly argue that Hicks does not allege "that any defendant was aware of any

constitutional violations in which they might have intervened other than ones that the defendants

themselves are alleged to have committed," thus precluding liability.  ECF 29 at 25; *see* Jackson,

939 F. Supp. 2d at 232.  The claim additionally fails as Hicks has not sufficiently pleaded any constitutional violations.  *See* Feinberg, 2004 WL 1824373, at *4.

> d.  Civil Rights Conspiracy (Count IV)

A plaintiff alleging a Section 1983 conspiracy must demonstrate "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  Although a conspiracy and a defendant's involvement therein may be established through circumstantial evidence, In re Dana Corp., 574 F.3d 129, 153–59 (2d Cir. 2009), "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks and citations omitted).

Defendants argue that the intracorporate conspiracy doctrine applies and bars Plaintiff's claim.  ECF 29 at 24.  This doctrine prevents employees of the same corporate entity from legally conspiring with each other.  The Second Circuit has recognized the doctrine in the Section 1985 context, *see* Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008), but has not yet determined its applicability to Section 1983 conspiracy claims.  *See* Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013).  Several district courts have held that the doctrine's rationale "applies with equal force in the Section 1983 context," and have also found a "personal stake" exception "when the alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal."  Chamberlain, 986 F. Supp. 2d at 388; *see also* Alvarez v. City of N.Y., No. 11-CV-5464, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012) (noting that exception applies "where law enforcement allegedly exercises

official duties in unconstitutional ways in order to secure personal benefit"); *but see* Peacock v. City of Rochester, No. 16-CV-6046 (MAT), 2016 WL 2347448, at *12 (N.D.N.Y. May 4, 2016) (declining to apply the doctrine in the Section 1983 context).

This Court agrees that the intracorporate conspiracy theory applies to Section 1983 claims. Hicks has failed to plead sufficient facts showing an agreement between, or "collective desire" of, specific defendants to deprive him of his rights, thus precluding any application of the personal stake exception. *See* Chamberlain, 986 F. Supp. 2d at 389. He instead asserts a speculative conclusion that "Defendants Marchman, Catalano, Lynch, and John and Jane Doe police officers, . . . agreed among themselves and with other individuals to act in concert in order to deprive Mr. Hicks [of his constitutional rights]." Compl. at ¶ 121. These allegations are not "amplified by specific instances of misconduct" and are insufficient to state a claim. Ciambriello, 292 F.3d at 325 (internal quotations and citations omitted).

**CONCLUSION**

The Court GRANTS Defendants' motion to dismiss. Mr. Hicks' conviction was not obtained by any violations of the Constitution or laws of the United States. The Clerk is directed to enter judgment dismissing Plaintiffs' Complaint.

Dated: New York, New York
     February 7, 2017

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge